FILED

2009 May-04  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID M. ADCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 2:08-CV-1-VEH** |
| | ) | |
| OGIHARA AMERICA CORP., | ) | |
| | ) | |
| Defendant. | ) | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Before the Court is the Defendant's Motion for Summary Judgment. (Doc. 18.) As discussed in greater detail below, the Court finds that the pending motion is due to be **GRANTED IN PART AND OTHERWISE DENIED**.

This is a case brought for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2901 *et seq*.  The Plaintiff claims that the Defendant interfered with his rights under the FMLA and retaliated against him in violation of his rights under the FMLA by discharging him after taking leave to care for his ailing wife.  The Defendant argues that the Plaintiff did not obtain proper certification for his leave and that it was entitled to fire the Plaintiff pursuant to its "no fault

attendance policy," under which the Plaintiff had accumulated an excessive number of absences.  Further, the Defendant argues that the Plaintiff is not entitled to pursue his FMLA claims at all in this court because the Plaintiff failed to disclose the existence of this cause of action on his filings in bankruptcy court.

As discussed in greater detail below, the Court finds that the Plaintiff is estopped from pursuing his damages claims in this court but that he is entitled to proceed with his claims for injunctive relief.  The Court also finds that genuine issues of material fact preclude entry of summary judgment as to the equitable portions of Plaintiff's FMLA claims.

## II.   FACTUAL AND PROCEDURAL HISTORY[1]

Ogihara America Corp. ("Ogihara") is located in Pinson, Alabama and functioned as a supplier to several automotive companies prior to a sale of its assets to a third party.  (Doc. 19, AF[2] 1.)  Upon hiring, Ogihara employees, referred to as

---

[1] These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by the Service that Plaintiff has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Plaintiff has adequately disputed a fact offered by Defendant, the Court has accepted Plaintiff's version. The Court's numbering of admitted facts (*e.g.*, AF 1) corresponds to the numbering of Defendant's Statement of Facts as set forth in Doc. 19 and responded to by Plaintiff in Doc. 22.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF 5.2) would indicate the second

Associates, receive a copy of an Associate Handbook.  (Doc. 19, AF 2.)  The Associate Handbook includes a description of its attendance program, which includes a description of certain "points" that an associate may be assessed for "all absences, late arrivals and early leaves if they are not pre-approved leave."  (Doc. 20, Ex. 4, ADC 00065.)  A "late arrival," meaning that an associate "arrive[s] late, but within four hours of [his] scheduled start time"  receives one half point in the attendance record.  (*Id.* at 00066.)  An absence that is not due to vacation or another scheduled day off receives one point.  (*Id.*)  Further, "[e]ach point is removed from [an associate's] record after one year of [the] occurrence.  Any Associate who accumulates 9 or more points on their active attendance record is subject to discharge."  (*Id.*)

The Associate Handbook also contains an FMLA Policy, which generally sets forth that an Associate is eligible to take up to twelve weeks of unpaid family/medical leave within any twelve-month period.  (Doc. 22, Ex. 7.)  Under a section of its FMLA policy entitled "Notice of Leave," the handbook says that "[i]f your need for family/medical leave is foreseeable, you must give OAC at least 30 days prior written

---

sentence of paragraph 5 of Defendant's Statement of Facts is the subject of the court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiff's Statement of Facts contained in Doc. 22 and responded to by Defendant in Doc. 23. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

notice. if this is not possible, you must at least give notice as soon as possible (within 1 to 2 business days after learning of your need for leave)." (*Id.*)  Finally, under the heading "Medical Certification," the policy provides that "you and the appropriate health care provider must supply appropriate medical certification," and it further states under the heading "Reporting While on Leave" that "[an associate] must give notice as soon as practical (within two (2) business days) if the dates of leave change or initially were unknown." (*Id.*)

To request time off, Ogihara associates are required to complete an Associate Request Form, which is ordinarily signed by an associate's "facilitator" or Department Manager; however, FMLA leave (unless intermittent leave had been approved) is required to be signed by Ogihara's human resources department ("Associate Relations").  (Doc. 19, AF 8; Doc. 22, Ex. 7.)  If a request for FMLA leave was approved, an associate would not receive attendance points.  (Doc. 19, AF 11.)

In requesting FMLA leave, an associate as required to notify his facilitator, sign the FMLA log, and meet with a member of the human resources department, who would subsequently create a leave request memo for the associate.  (Doc. 19, AF 12-13.)

Plaintiff, David M. Adcock ("Adcock") was hired as a production associate at

Oghiara in July, 2002, and upon his hire he receive a copy of the Associate Handbook.  (Doc. 19, AF 16-17.)  Adcock kept up with his attendance points and understood that accumulating nine or more points in one year could result in his termination.  (Doc. 19, AF 18-19.)

On December 25, 2004, Adcock suffered a heart attack.  (Doc. 19, AF 22.)  He completed the necessary paperwork for FMLA leave and his request was approved. (Doc. 19, AF 23.)  Adcock was also granted FMLA leave following his wife's gastric bypass surgery in March, 2005.  (Doc. 19, AF 25.)  After both periods of FMLA leave, Adcock was returned to his same position.  (Doc. 19, AF 30.)

On October 30, 2005, Adcock's wife admitted to him that, as a consequence of taking painkillers for her surgery, she had become addicted to the drugs.  (Doc. 19, AF 31.)  Shortly thereafter, she was admitted to a treatment facility, Bradford, to undergo substance abuse treatment for a period of fourteen days.  (Doc. 19, AF 32.) Adcock also participated in family therapy as part of his wife's treatment on November 14-16, 2005.  (Doc. 19, AF 33.)

On November 7, 2005, Adcock informed a member of human resources, Anessa Osborn ("Osborn"), that his wife needed drug rehabilitation and he completed an "Associate Request Form," indicating that he needed leave beginning on November 14 and returning to work on November 17.  (Doc. 19, AF 34-35; Ex. 15.)

5

Subsequently, Adcock met with Osborn, to whom he indicated that he might also need more than three days off because he could be required to provide psychological comfort to his wife. (Doc. 22, Adcock Dep. at 82:5-84:5.) Accordingly, in her leave request memo, Osborn wrote that Adcock's leave should continue until on or about an "unknown" date. (Doc. 20, Ex. 17, ADC 0019.) Osborn explained to Adcock that she was listing an unknown return date in case he needed additional time. (Doc. 22, Adcock Dep. at 90:6-18.) Osborn also told Adcock to have a physician mark "yes" on the psychological comfort portion of Ogihara's FMLA certification document[3] so that he would be covered in the event that he needed more than three days off. (Doc. 19, AF 37.)

Adock's certification form was mailed to Ogihara shortly thereafter, and it stated that the "probable duration" of his wife's condition (and the necessity of his absence from work) would range from November 14-16. (Doc. 20, Ex. 16; Doc. 19, AF 39-41; Doc. 22, Adcock Dep. at 90:10-19.) The certification statement also indicated that Adcock was needed to provide "psychological comfort" to his wife, as Osborn had instructed Adcock to do in order to be covered for additional time Adcock spent supporting his wife. (Doc. 20, Ex. 16 ADC 0010 (emphasis in

---

[3] Ogihara used a standard form provided by the U.S. Department of Labor. (Doc. 20, Ex. 15.)

original).)  Osborn certified Adcock for "Continuous FMLA leave . . . beginning 11/14/05-11/16/05" but, based on their prior conversation, Adcock believed that he could take additional time off if he was needed for the psychological support of his wife.  (Doc. 22, Adcock Dep. at 90:10-19; Doc. 20, Ex. 18, ADC 0005.)

Adcock's wife was discharged from treatment on November 16, 2005, and Adcock returned to work on November 17th.  (Doc. 22, Adcock Dep. at 92:3-14.)  On November 18th, Adcock's wife began exhibiting withdrawal symptoms and had a panic attack; Adcock stayed home to provide psychological comfort to her.  (Doc. 22, Adcock Dep. at 95:11-96:14.)  His wife's physician had informed Adcock that he should not leave her side if she suffered severe withdrawal symptoms.  (Doc. 21, AAF 10.)  Adcock believed that his absence was covered under the FMLA and he called the hotline to report that he would not be at work; he planned to file the necessary paperwork on the next workday.  (Doc. 115:6-116:20.)

Adcock submitted his paperwork on November 21, 2005; he indicated on the form that his wife was "sick" and he checked a box designated for FMLA leave. (Doc. 19, AF 51-52.)  When Adcock explained his absence, Adcock's boss, Greg Marlin, reported that Adcock was already approved for FMLA leave and that he had already talked to Osborn at human resources and that he was approved for the leave. (Doc. 22, Adcock Dep. at 100:13-101:20.)

After Adcock turned in his paperwork, Osborn followed up with Adcock and explained that she needed a medical excuse for his absence, because Bradford's certification did not cover the absence. (Doc. 19, AF 55.)  Because Adcock's wife was no longer a patient, Bradford would not provide an additional excuse, despite the attempts of Osborn, Adcock, and Adcock's wife to obtain such an excuse.  (Doc. 19, AF 57.)  When Adcock spoke to a provider at Bradford, he was told that Bradford had indicated that he should provide psychological comfort and that Ogihara did not need an additional excuse.  (Doc. 113:5-114:7.)

On or about January 3, 2006, Adcock met with his supervisors and Osborn and reported that he did not have an excuse for his November 18, 2005, absence.  (Doc. 19, AF 60.)  Ogihara then assessed an attendance point against Adcock and, because he had left early on one occasion in December, Adcock had a total of 9.5 points in a twelve month period.  (Doc. 19, AF 61-62.)  Because of his accrued points, Ogihara terminated Adcock.  (Doc. 19, AF 63.)  With the assistance of his attorney, Adcock penned a memo to Ogihara, explaining that "[I]f my employment is terminated due to not being able to produce a physician's excuse for November 18th, I feel Ogihara would wrongfully be discharging me."  (Doc. 20, Ex. 24.)

Following his discharge, Adcock filed a petition for bankruptcy and when he signed the petition, he knew that it was signed under penalty of perjury.  (Doc. 19, AF

8

68.)  Although he was required to list all assets on his petition, Adcock did not list the instant case as an asset and he failed to supplement his list of assets after reopening the case in 2007 and before his discharge on March 14, 2008.  (Doc. 19, AF 69-71.)

Adcock filed this lawsuit on January 2, 2008, alleging a cause of action under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*.  (Doc. 1.)  He brought two counts under the FMLA, one for interference with FMLA rights, and one for retaliation.  (*Id.*)  As a remedy, Adcock seeks reinstatement, damages, injunctive relief, attorney's fees, liquidated damages, and other appropriate legal or equitable relief.  (*Id.* at 10-11.)

Ogihara filed its Motion for Summary Judgment, its brief in support, and its evidentiary material on March 16, 2009.  (Docs. 18-20.)  Adcock filed a Response in Opposition and evidentiary material on April 6, 2009.  (Docs. 21-22.)  Finally, Ogihara filed a its reply brief on April 17, 2009.  (Doc. 23.)  The motion is now under submission to the Court.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real*

10

*Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to

point out to the court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   ANALYSIS

### A.    Judicial Estoppel

Judicial estoppel is an equitable doctrine that precludes a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th Cir.2002). The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id*. (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). A district court's application of judicial estoppel is reviewed for

abuse of discretion. *See id*. at 1284.  A determination on the applicability of judicial estoppel involves analysis of two factors: (1) "a party's allegedly inconsistent positions must have been made under oath in a prior proceeding," and (2) "the inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1293-1294 (11th Cir. 2003) (internal quotations and citations omitted).   "These two enumerated factors are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine." *Id.*.

In the context of a bankruptcy case, judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff both knew about the claims and had a motive to conceal them from the bankruptcy court. *DeLeon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir.2003).  "The doctrine bars a plaintiff from pursuing employment discrimination claims for damages that were not disclosed in a prior bankruptcy proceeding, where the plaintiff knew of the claims and had a motive to conceal them from the court." *Casanova v. Pre Solutions, Inc.*, 228 Fed.Appx. 837, 840-841 (11th Cir. 2007) (citing *Burnes*, 291 F.3d at 1287-88; *Barger*, 348 F.3d at 1293-97; *De Leon*, 321 F.3d at 1291).  In considering a party's motive to conceal, courts look to whether the facts demonstrate

13

"intentional contradictions, not simple error or inadvertence." *Burnes*, 291 F.3d at 1286.

A debtor seeking shelter under the bankruptcy laws must disclose all assets or potential assets to the bankruptcy court. 11 U.S.C. §§ 521(1), 541(a)(7). The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change. *Burnes* at 291 F.3d at 1286. A debtor even has a duty to amend his schedule of assets to disclose a complaint that he filed after his plan to pay his creditors had been confirmed. *See Ajaka v. BrooksAmerica Mortgage Corp.*, 453 F.3d 1339, 1344 (11th Cir.2006). "The debtor need not know all the facts or even the legal basis for the cause of action; rather, if the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed. " *Union Carbide Corp. v. Viskase Corp.*, 183 B.R. 812, 821 n. 17 (Bankr. N.D. Ill. 1995).

The parties primarily dispute the impact of *Burnes v. Pemco Aeroplex, Inc.* on the pending claims; therefore, a full discussion of *Burnes* is appropriate. (*See* Docs. 19 at 20-23; 21 at 8-11.) In *Burnes*, the plaintiff had filed for Chapter 13 relief in a bankruptcy court; six months after filing the petition, he filed a discrimination charge with the EEOC against his employer. 291 F.3d at 1284. The plaintiff never amended

14

his schedule of assets or statement of financial affairs to include the pending lawsuit as an asset.  *Id.* The plaintiff also subsequently converted his Chapter 13 petition into a Chapter 7 petition but, nevertheless, failed to reveal the lawsuit in his filings with the court.  *Id.*  Upon learning of this fact, his former employer moved for summary judgment on the grounds of judicial estoppel.  *Id.*  The district court granted the motion and the case was appealed to the Eleventh Circuit, wherein the court set forth the above-described two-factor test.  *Id* at 1286.  It also recognized that, in bankruptcy proceedings, "the importance of full and honest disclosure cannot be overstated."  *Id.* (citations omitted).

The case turned on whether the plaintiff's omission of the litigation from his bankruptcy estate was intentional, such as to make a mockery of the judicial system. *Id*.  The Court noted that "intentional manipulation can be inferred from the record" and that, under the circumstances of the case, the plaintiff "possessed the requisite intent to mislead the bankruptcy court" and that judicial estoppel was properly applied because the plaintiff stood to benefit from his creditors' lack of knowledge of his claim for damages. *Id*. at 1287.  However, with respect to the plaintiff's injunctive claims, the court held that because the injunctive relief "offered no monetary value to the estate," it was "of no consequence to the trustee or the creditors." *Id.*  at 1289.  Therefore, the plaintiff was entitled to pursue his injunctive

15

claims.  *Id.*

As in *Burnes*, it is undisputed that Adcock did not report this litigation on his

bankruptcy petition–either when he filed his bankruptcy petition or in any amendment

to his financial statements (Doc. 19, AF 68-71); therefore, resolution of this issue

depends upon Adcock's intent in failing to disclose his litigation.  Adcock attempts

to distinguish *Burnes* by arguing that the he "file[d] his complaint . . . almost two

years [] since he first filed for bankruptcy" instead of preceding the motion to convert

in *Burnes*.  (Doc. 21 at 9.)  Adcock also argues that, in *Burnes*, "the employment

discrimination claim was ongoing during the entirety of the case."  (*Id.* at 9-10.)

Both of these attempts to distinguish *Burnes* are unconvincing.  First, although

Adcock filed his bankruptcy petition in 2006, after his discharge from Ogihara, he

reopened the bankruptcy case in 2007, shortly before he filed his Complaint in this

action in January, 2008.  Adcock was discharged from bankruptcy in March, 2008

and was at all times under a continuing duty to amend his financial statements if

circumstances changed.  *See Burnes* at 1286; *Ajaka*, 453 F.3d at 1344.  Clearly, the

filing of a lawsuit in which he sought significant monetary damages represented a

change in circumstances. Adcock is also incorrect in arguing that the employment

discrimination claim in *Burnes* was ongoing during the entirety of the case.  In fact,

the Plaintiff in *Burnes* filed his employment discrimination lawsuit <u>after</u> his first

petition and prior to his motion to convert.

In any event, *Burnes* is not distinguishable based on the sequence of events involved.  Adcock was clearly under a duty to disclose this potential asset after he reopened his petition and prior to the closure of the petition in 2008.  This conclusion is buttressed by cases cited in support of the decision in *Burnes*.  The court in *Burnes* cited with approval the Fifth Circuit's decision in *In re Coastal Plains*, 179 F.3d 197, 210 (5th Cir. 1999).  *Burnes*, 291 F.3d at 1287.  In *Coastal Plains*, the debtor sued a lender shortly <u>after</u> it filed a bankruptcy petition and the debtor had not initially listed the claims as an asset on its filings.  *Coastal Plains*, 179 F.3d at 202.   Citing other cases, the court wrote that "<u>[a]ny claim with potential must be disclosed</u>, even if it is contingent, dependent, or conditional."   *Id.* at 208 (emphasis in original). Emphasizing the importance of the disclosure duty, the court then held that the debtor had both knowledge of the claims and a motive to conceal them since, if the creditors knew of the claims, a different result might have been reached in the bankruptcy court. *Id.* at 212-213.  Therefore, the court judicially estopped the debtor's successors in interest from pursuing the claims.  *Id.*

None of the cases cited by either party suggests that Adcock did not have a duty to disclose his potential cause of action at the time he filed his bankruptcy petition or at the time he reopened it and no cases suggest that Adcock did not have

a duty to amend his petition when he filed the pending lawsuit while his bankruptcy case was still open.   The decision in *Coastal Plains* indicates that it makes no difference whether the lawsuit was filed before or after the bankruptcy petition.   Thus, the Court rejects Adcock's attempt to distinguish *Burnes* on this ground.

In fact, other than the distinction in the time-line of when the relevant pleadings were filed, this case closely resembles *Burnes*.   As in that case, Adcock stood to gain significantly by not including his discrimination-based damages claims in his bankruptcy estate, i.e., he could have secured a discharge of his liabilities and thereafter proceeded with his possibly valuable claims against Ogihara.   Adcock clearly had a motive to falsify his financial statements.

The Eleventh Circuit also addressed a similar issue in *Barger v. City of Cartersville, Ga.*,   348 F.3d 1289 (11th Cir. 2003).   In *Barger*, the plaintiff had already filed and was pursuing her employment discrimination claim at the time she filed her bankruptcy petition.   *Id.* at 1294-1295.   However, she failed to mention the lawsuit in her filings with the bankruptcy court.   *Id.* at 1295.   The court wrote that "[t]he  failure to comply with the Bankruptcy Code's disclosure duty is 'inadvertent' [and not intentional] only when a party either lacks knowledge of the undisclosed claims or has no motive for their concealment."   *Id.*   The court found that the plaintiff had a motive to conceal her claims: "[o]mitting the discrimination claims from the

18

schedule of assets appeared to benefit her because, by omitting the claims, she could keep any proceeds for herself and not have them become part of the bankruptcy estate." *Id*.

In light of the above-cited cases, the Court finds that both of the *Burnes* factors are satisfied and that judicial estoppel bars Adcock's claims for damages.  Adcock's conduct was "calculated to make a mockery of the judicial system" because the facts establish that he had knowledge of the claims throughout his bankruptcy and he had a motive to conceal the claims' existence.

However, as Adcock notes in his brief, judicial estoppel does not apply to his claims for injunctive relief since, under *Burnes*, claims that provided "no value to the bankruptcy estate" are not assets and were therefore not improperly concealed.  (Doc. 21 at 10 (citing *Burnes*, 291 F.3d at 1289).)   Ogihara failed to respond to this argument in its reply brief.  Although the Court in *Burnes* explained that its ruling on the plaintiff's claims for non-monetary relief was bound to the facts, 291 F.3d at 1289 n.3, the facts in *Burnes* closely parallel this case.  The Court finds that Adcock's request for reinstatement (his injunctive relief) was of no value to the bankruptcy estate. *See also*, *Casanova v. Pre Solutions, Inc.* 228 Fed.Appx. 837, 841 (11th Cir. 2007) (barring damages claims under the doctrine of judicial estoppel, but permitting injunctive claims for reinstatement to proceed).

Ogihara's motion for summary judgment is due to be **GRANTED** insofar as it relates to Adcock's claims for damages under the FMLA.  However, it is due to be **DENIED** with respect to his claims for injunctive relief.  Since Adcock's non-monetary claims remain viable, the Court now turns to the merits of his FMLA claims.

### B.    FMLA

The FMLA grants an eligible employee the right to take up to twelve (12) "workweeks" of unpaid leave annually for any one or more of several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It also creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. §§ 2615(a)(1), 2617(a).  The Eleventh Circuit has stated that the FMLA recognizes two types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir.2001).  This case involves both an interference claim and

a retaliation claim.  The Court first turns to Adcock's interference claim.

      1.   <u>Interference</u>

Regarding interference claims, the Eleventh Circuit set forth the relevant standards in *Drago v. Jenne*:

> Among the substantive rights granted by the FMLA to eligible employees are the right to '12 workweeks of leave during any 12-month period. . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee,' 29 U.S.C. § 2612(a)(1), and the right following leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position, 29 U.S.C. § 2614(a)(1)." *Strickland*, 239 F.3d at 1206. To state a FMLA interference claim, a plaintiff must demonstrate that he was entitled, under the FMLA, to a benefit that he was denied. *See Strickland*, 239 F.3d at 1207.

453 F.3d 1301, 1305-6 (11th Cir. 2006).   An employee is also entitled to FMLA leave "to care for the spouse . . . of [an employee] if such  spouse . . . has a serious health condition."  Applicable regulations further provide that a statement on a medical certification that an employee "is 'needed to care for' a family member or covered servicemember encompasses both physical and psychological care."  29 C.F.R. § 825.124.   "The term ['needed to care for'] also includes providing <u>psychological comfort</u> and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care."  *Id.*  (emphasis added).

However, "employers have a statutory right to require an employee requesting FMLA leave to obtain certification that attests to the employee's eligibility for such leave from a health care provider." *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) (citing 9 U.S.C. § 2613(a)); *see also id.* § 2613(b)(2) (explaining that a "sufficient" certification is one that, *inter alia*, states "the probable duration of the condition").  Applicable regulations regarding certification provide:

> The employee must provide a complete and sufficient certification to the employer if required by the employer in accordance with §§ 825.306, 825.309, and 825.310. The employer shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient. A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. <u>A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive</u>. The employer must provide the employee with seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts) to cure any such deficiency. If the deficiencies specified by the employer are not cured in the resubmitted certification, the employer may deny the taking of FMLA leave.

29 C.F.R. § 825.305 (emphasis added).  Additionally, according to the relevant provisions governing certification requirements for leave taken because of a family member's illness, a medical certification need only provide "information sufficient to establish that the family member is in need of care, as described in § 825.124, and an estimate of the frequency and duration of the leave required to care for the family

member." 29 C.F.R. § 825.306(a)(5).  The term "needed to care for" encompasses "psychological comfort."  29 C.F.R. § 825.124.  "In the case of unforeseeable leave, an employer may deny FMLA coverage for the requested leave if the employee fails to provide a certification within 15 calendar days from receipt of the request for certification unless not practicable due to extenuating circumstances . . . [i]f the employee never produces the certification, the leave is not FMLA leave."  29 C.F.R. § 825.14.

Additionally, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."29 C.F.R. § 825.220(c); *see also Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir.2001) (explaining that to prevail on an FMLA interference claim, an employee "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her"). Thus, "a termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA." *Barnett v. Revere Smelting & Refining Corp.*, 67 F.Supp.2d 378, 388 (S.D.N.Y.1999).

Ogihara first argues that Adcock's FMLA interference claim should be dismissed because Adcock did not provide proper certification of his absence to care

for his wife following her release from Bradford.  (Doc. 19 at 23-26.)  According to Ogihara, "the undisputed facts evidence that the medical certification submitted to Ogihara by Bradford made clear that [Adcock] was needed to care for his wife on November 14, 15, and 16, 2005," and that "[n]o other dates were provided in the certification, sought by plaintiff's leave request or were subsequently provided to Ogihara."  (*Id.* at 24.)

However, the Ogihara handbook only requires "appropriate medical certification." (Doc. 22, Ex. 7.)   This term is not defined anywhere in the handbook. *See id.*; Doc. 22, Adcock Dep. at 122:21-123:7.)  Osborn further told Adcock that he only needed a physician to mark that his presence was needed to provide psychological comfort to his wife.  (Doc. 19, AF 37.) Besides the fact that the Ogihara handbook does not indicate that Adcock's certification was inadequate as well as the fact that his human resources manager told him that he would be covered if he provided certification in the manner that he did, nothing in any of the FMLA regulations cited *supra* suggest that the certification was deficient.   In fact, a certification need only <u>estimate</u> the intended duration of the absence.  29 C.F.R. § 825.306(a)(5).  No specific duration is required under the FMLA, and the level of care provided by Adcock is well within the coverage of the FMLA.   29 C.F.R. § 825.124.

The certification form at issue also listed only the <u>probable</u> duration of Adcock's leave of absence. (*See* Doc. 19, Ex. 16.)  But, by indicating that Adcock's presence may be necessary to provide psychological comfort to his wife, the certification indicated that Adcock's leave of absence might be longer, <u>depending on his wife's response</u>.  The current facts for purposes of the instant motion indicate that Adcock's wife was exhibiting withdrawal symptoms and that his wife's physician told him that he needed to stay with her if the symptoms were severe. (Doc. 21, AAF 10.)  Thus, neither the regulations under the FMLA, Ogihara's handbook, nor the oral statements of Ogihara's own employees establish that Adcock's medical certification was insufficient.

Ogihara next argues that Adcock was not "needed to care for" his wife. (Doc. 19 at 26.)  In making this argument, Ogihara entirely overlooks the facts for purposes of summary judgment.  For instance, Ogihara argues that Adcock "has offered no evidence showing that he was needed to provide psychological comfort on November 18, 2005." (*Id.*)  It fails to mention, however, that evidence in the record suggests that Adcock's wife's physician advised that he remain with her if she experienced withdrawal symptoms and that, on the morning of the 18th, she did indeed exhibit such symptoms. (*See* Doc. 21, AAF 10.)  While Adcock did indicate that he "hung out" with his wife on that day, other statements indicate that his presence was much

more necessary than mere social companionship.  Ogihara's cited cases are also not

comparable to the facts of this case because they assume that Adcock's presence with

his wife was only to provide social companionship.  The cited cases primarily involve

similar innocuous activities such as visiting a sick relative or performing errands.  (*Id.*

at 27 (citing *Overley v. Covenant Transport, Inc.*, 178 Fed. Appx. 488, 495 (6th Cir.

2006) (denying leave where employee oversaw her daughter's trust); *Roff v. Low*

*Surgical & Medical Supply, Inc.*, No. CV-03-3655-SJF, 2004 WL 5544995 at *9

(E.D.N.Y. May 11, 2004 ) (finding that an employee was not "needed to care for" a

family member when employee only sought to visit a sick relative and did not make

a further showing); *Fioto v. Manhattan Woods Golf Enterprises, LLC*, 270 F.Supp.

2d 401, 403 (S.D.N.Y. 2003) ("Merely visiting a sick relative does not fall within the

statute's parameters. The employee must be involved in providing some sort of

on-going care for his relative in order to qualify for FMLA leave."); *Cianci v.*

*Pettibone Corp.*, No. 95-C-4906, 1997 WL 182279 (N.D. Ill. April 8, 1997)

("However sympathetic [the plaintiff's] request to visit her ailing mother may have

been and however unfair or uncaring the company's response, the evidence before this

court indicates that it is not the type of leave to which she is statutorily entitled.").)

These cases simply do not apply to the current facts for purposes of the instant

motion. Adcock has produced evidence from which a reasonable jury could find that

he was "needed to care for" his wife–who would have otherwise been alone while experiencing her withdrawal symptoms–and that his absence from work was therefore included under the coverage of the FMLA.  Genuine issues of material fact preclude the Court from making a finding in favor of Ogihara.

Finally, Ogihara argues that it "took no action that deprived [Adcock] of an FMLA right to which he was allegedly entitled."  (Doc. 19 at 27.)  This argument essentially restates its previous two arguments as to Adcock's FMLA interference claim.  Namely, Ogihara contends that Adcock did not obtain proper certification of his absence and that his termination therefore did not interfere with his rights under the FMLA.  (Doc. 19 at 28.)  However, as explained *supra*, Ogihara's written policy did not specify that Adcock would need a doctor's certification for the precise amount of time he needed for leave and FMLA regulations do not impose this requirement.  Ogihara also told Adcock that he could take additional leave if his wife's physician indicated that he was needed to provide psychological comfort.  Therefore, these arguments must fail.  Ogihara's motion is due to be **DENIED** as to Adcock's FMLA interference claim for injunctive relief.

2. Retaliation

A plaintiff bringing a retaliation claim under the FMLA must demonstrate "that his employer's actions were motivated by an impermissible retaliatory or

discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotations and citations omitted). To succeed on a retaliation claim, an employee must demonstrate that his employer <u>intentionally</u> discriminated against him in the form of an adverse employment action for exercising an FMLA right. *Id.* The Eleventh Circuit specified in *Strickland* that, in the absence of direct evidence[4], a claim of retaliation brought under the FMLA should be analyzed under the same burden-shifting framework as is used in Title VII cases, i.e., the *McDonnell Douglas* framework. *Id.*

Under this framework, the employee must first establish his *prima facie* case. In order to state a *prima facie* case of retaliation, an employee must prove that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) there was some causal relation between the two events. *Id.* After the employee has established this *prima facie* case, the employer has an opportunity to articulate a legitimate nonretaliatory reason for the challenged employment action. *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n. 54 (11th Cir.1995). Ultimately, the plaintiff must bear the burden of proving retaliation by a preponderance of the evidence and that the legitimate non-retaliatory reason provided by the employer is a pretext for prohibited retaliatory conduct. *Goldsmith*

---

[4] Neither of the parties contend that this case involves direct evidence. (*See* Docs. 19 at 29-32; 21 at 17-18.)

28

*v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir.2008).

Defendant first argues that Adcock "has not availed himself of a protected right under the FMLA" and that he therefore cannot state a *prima facie* case of retaliation. (Doc. 19 at 30.)   This argument relies on Ogihara's previously rejected contention that Adcock did not obtain proper certification for his absence.   However, genuine issues of material fact preclude making that determination.   *See supra* at 24-26. Ogihara also argues that Adcock's *prima facie* case fails because he has not provided "any evidence of causation between any of his FMLA leave requests and his January 5, 2006 termination."   (Doc. 19 at 31.)   This argument cannot be taken seriously since, as soon as Ogihara decided that Adcock's absence was not covered by the FMLA, it terminated him. (Doc. 22, Kirksey Dep. at 122:14-21.)   The nearly instantaneous decision to terminate Kirksey after denying him FMLA leave is sufficient to establish the causal element of his *prima facie* case.   *Cf. Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (finding that the causal element of a retaliation claim was satisfied when a plaintiff was discharged one month after filing an EEOC charge); *see also Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.").   Thus,

Ogihara's argument that Adcock cannot establish a *prima facie* case must fail.

Next, Ogihara argues that its nondiscriminatory reason for discharging Adcock–his violation of the attendance policy–has not been rebutted by a showing of pretext. (Doc. 19 at 31-32.) Because Adcock accumulated more than nine attendance points during one twelve month period, Ogihara argues that Adcock was properly discharged. (*Id.*) Adcock bears the ultimate burden in demonstrating pretext. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 515-517 (1993).

In discussing pretext, the Eleventh Circuit Court has explained that

> [t]o show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)).

"[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982). "'A plaintiff employee may not establish that an employer's proffered reason

is pretextual merely by questioning the wisdom of the employer's reason' as long as 'the reason is one that might motivate a reasonable employer.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) ("[F]ederal courts do not sit to second-guess the business judgment of employers.")). "The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Further, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

"[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert*, 439 F.3d at 1298 (citing *Bass v. Bd. of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1108 (11th Cir.2001) (stating that employer's violation of its own hiring procedure could be evidence of pretext); *Rudin v. Lincoln Land Community Coll*, 420 F.3d 712, 727 (7th Cir.2005) ("An employer's failure to follow its own internal employment procedures can constitute evidence of pretext.").)

In rebuttal to Ogihara's pretext argument, Adcock argues that an employee "cannot evade liability for a retaliatory discharge merely by wrongly deciding it is

going to discipline an employee illegally and then terminate him because the illegal discipline mandated it." (Doc. 21 at 18.)  Improperly counting Adcock's absence as not covered by the FMLA does not, *ipso facto*, establish that Oghihara's reasons for discharge were merely a pretext for discrimination (Ogihara's good faith belief that the absence was not covered would be sufficient to show the absence of pretext). However, Adcock has produced evidence that would allow a jury to find that Ogihara's nonretaliatory reason for discharge is not offered in good faith. Specifically, a jury could find that pretext is established based on Ogihara's representation to Adcock that his subsequent absences would be covered if his wife's doctor indicated on the FMLA certification form that Adcock's presence was necessary to provide psychological comfort to his wife.  A jury could also infer pretext from the fact that Ogihara's own written policy does not state that a doctor's excuse is not required for every day that an employee will be absent.  Consequently, Adcock has presented enough evidence to avoid summary judgment on the issue of pretext.  Ogihara's motion is due to be **DENIED** as to Adcock's FMLA retaliation claim for injunctive relief.

## V.    CONCLUSION

Ogihara's Motion for Summary Judgment (Doc. 18) is due to be **GRANTED IN PART** and **OTHERWISE DENIED**.  Specifically, the Court finds that judicial

estoppel bars Adcock from pursuing his damages claims, since Adcock failed to report these claims in any of his filings with the bankruptcy court. However, Adcock's non-monetary claims are not barred by judicial estoppel because they would not have added value to his bankruptcy estate. Regarding the merits of Adcock's FMLA claims, the Court finds that genuine issues of material fact preclude the Court from entering summary judgment on either the interference claim or the retaliation claim. A separate Order consistent with these findings will be entered.

**DONE** and **ORDERED** this the 4th day of May, 2009.

VIRGINIA EMERSON HOPKINS
United States District Judge